## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTIAN BROTHERS EMPLOYEE RETIREMENT PLAN, and DAN STREMEL, in his capacity as Chairperson of the Pension Board,<br><br>                Plaintiffs,<br><br>        v.<br><br>ALLIANZ GLOBAL INVESTORS U.S. LLC, ALLIANZ GLOBAL INVESTORS U.S. HOLDINGS LLC, ALLIANZ SE, ALLIANZ ASSET MANAGEMENT GMBH, ALLIANZ OF AMERICA, INC., ALLIANZ ASSET MANAGEMENT OF AMERICA HOLDINGS INC., ALLIANZ ASSET MANAGEMENT OF AMERICA LLC, ALLIANZ ASSET MANAGEMENT OF AMERICA LP, AND PFP HOLDINGS INC.<br><br>                Defendants. | Case No. 21-cv-7388<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL<br><br>**ECF CASE** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     PARTIES .......................................................................................................... 10

        A.      Plaintiff ERP ................................................................................... 10

        B.      Defendants ...................................................................................... 10

III.    JURISDICTION AND VENUE ...................................................................... 15

IV.     FACTUAL ALLEGATIONS .......................................................................... 16

        A.      Background of the Allianz Global Investors Enterprise ........................ 16

        B.      AllianzGI's Duties to ERP and the Alpha 500's Mandate ................... 19

        C.      AllianzGI's Duties to ERP Included Ensuring That the Alpha 500
                Was Adequately Hedged to Protect Investors Against Downside
                Risk ................................................................................................ 25

        D.      AllianzGI Abandoned Needed Risk Protections Amid Widespread
                Evidence of an Impending Market Downturn ..................................... 30

        E.      AllianzGI's Imprudent Investments and Self-Interested
                Mismanagement in March 2020 Locked in the Alpha 500's Losses .... 34

        F.      In a Desperate Attempt to Stem Losses, Allianz Manipulated A
                Key Volatility Index to Inflate the Alpha Funds' Valuations ............... 39

        G.      Following The Anticipated Market Conditions in February and
                March 2020, ERP Withdrew Its Remaining Investment in the
                Alpha 500 ........................................................................................ 42

V.      PRAYER FOR RELIEF .................................................................................. 53

VI.     JURY DEMAND ............................................................................................. 54

Plaintiffs Christian Brothers Employee Retirement Plan ("ERP") and Dan Stremel, in his capacity as Chairperson of the Pension Board of the ERP ("Stremel," and collectively with the ERP, the "Plan") by and through their undersigned counsel, allege the following against Defendants Allianz Global Investors U.S. LLC ("AllianzGI"), the Allianz Global Investor defendants (defined fully below), Allianz of America, Inc. ("Allianz of America") and Allianz SE ("Allianz SE") (Defendants AllianzGI, the Allianz Global Investor defendants, Allianz of America and Allianz SE may be referred to collectively as the "Allianz Defendants" or "Allianz") and asserts claims for negligence and breach of contractual and fiduciary duties arising from misconduct related to the ERP's investment in the AllianzGI Structured Alpha U.S. Equity 500 Fund ("Alpha 500," or the "Alpha Fund" or "Fund").

## I.    INTRODUCTION

1.    This case is about a fiduciary that improperly invested client assets, employed a reckless strategy contrary to its obligations to the ERP, and abandoned the risk controls it was required to have in place.  As set forth below, AllianzGI violated its contractual obligations and fiduciary duties by abandoning the Alpha 500's stated investment mandate and required downside risk protection positions, and then "doubled down" on its imprudent strategy after incurring losses at the very time when positions to protect against a market downturn were needed most.

2.    Rather than protect against the market downturn that Allianz's own chief economist had been warning about since January 2020 by ensuring the Alpha 500 remained market neutral and contained the "tail risk" hedging positions that were supposed to be the "cornerstone" of the Alpha 500's strategy, AllianzGI positioned the Fund's portfolio in a manner that all but guaranteed substantial losses once that downturn came to pass.  AllianzGI has since admitted that its positioning of the Fund's portfolio in late February and early March 2020 was done to "recoup" the losses the Fund incurred in February.  However, the portfolio's positions left the Fund

dangerously exposed to even the slightest increase in market volatility or decline in equity prices—the very conditions that Allianz economists, and many others, warned were on the immediate horizon.  AllianzGI did not simply make a bad call in the midst of a market disruption: it abandoned the Fund's investment mandate—repeatedly touted by Allianz and memorialized in contracts with the ERP—that the risk management and investment strategies employed by AllianzGI were designed to protect the Alpha Fund's investors against precisely the types of market conditions experienced in February and March of 2020.

3.     AllianzGI's extraordinarily risky and self-interested gamble resulted in massive multiple employer plan losses for the ERP, wiping out, in a matter of weeks, nearly $150 million of ERP's participants' retirement savings that had been accumulated over decades.

4.     The Alpha 500 was an investment vehicle marketed by Allianz Global Investors as part of a family of products known as the "Structured Alpha Funds" ("Structured Alpha," the "Structured Alpha Funds," the "Alpha Funds," or the "Funds") and managed at all times under the full investment discretion of AllianzGI.  The ERP was a passive investor in the Alpha 500, having ceded all discretion to its fiduciary, AllianzGI.  Broadly, the various Structured Alpha Funds all utilized the same investment strategy.  The Alpha Funds pursued a "portable-alpha" strategy that was supposed to replicate the performance of a given benchmark while simultaneously pursuing an actively managed options trading strategy that aimed to deliver outperformance over that benchmark.  The Structured Alpha Funds' purportedly unique "alpha" component—the actively managed options strategy overlay—was supposed to provide investors with downside protection and possible upside in both bull and bear equity markets, and in times of both high and low volatility.

2

5.      Generating returns in times of rising or falling equity markets and both low and high market volatility—*i.e.*, the price movement up and down of an investment or index compared to its average, and which typically increases in times of economic or investor uncertainty—was a key part of the Structured Alpha Funds' strategy.  As Allianz Global Investors stated in the Alpha Fund's marketing materials, which are incorporated into the agreements between the ERP and AllianzGI that defined the duties of AllianzGI, the Structured Alpha strategy "is for the portfolio's outperformance to behave independently of equity and fixed income markets."  Specifically, the strategy was to "combine[] long- and short-volatility positions at all times," to "capitalize on the return-generating features of selling options (short volatility) while simultaneously benefiting from the risk-management attributes associated with buying options (long volatility)," and to "optimize the balance between these two types of exposures."

6.      Further underscoring the supposedly conservative nature of the strategy, Allianz described its core investment objectives as including "protect[ing] against a market crash" and "navigat[ing] as wide a range of equity-market scenarios as possible," as set forth below:



7.      Critically, in pursuing these objectives, the Structured Alpha Funds were to be conservatively managed and protected "in the event of a market crash" by adhering to three core

tenets.  First, the Funds were to be "long and short volatility at the same time, all the time"—ensuring the Funds would benefit in times of both decreasing and increasing volatility.  Second, AllianzGI committed to pursuing a "market neutral" strategy in which the Funds would "never make a forecast on the direction of equities or volatility."

8.     Third, AllianzGI would guard against "adverse market environments" by employing "hedging positions" that were specifically designed to protect against a market downturn and employed solely for risk management purposes.  Specifically, the Funds' portfolios were always to be a "net buyer of put options," which Allianz explained provided "protection against a tail event or a market crash."  These "long-volatility" hedging positions, which were to be "purchased 'out of the money' at various levels to the downside, and always in a greater quantity than the amount of puts sold," were to be "in place at all times, exclusively for risk management purposes" and were "a cornerstone of the strategy's investment process."  These measures were summarized by Allianz as follows:

| Long and short volatility at the same time, at all times | • Pursue outperformance, but do not presume that the market will behave normally or that history will repeat itself |
| Designed to outperform irrespective of the market environment | • Never make a forecast on the direction of equities or volatility |
| Protect in adverse market environments | • Always be a net buyer of put options, providing protection against a tail event or market crash<br>• Prepare for the unexpected; pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses |

9.     The Alpha Fund's investment mandate required active portfolio management and close monitoring to ensure the portfolio was properly protected against a market crash and positioned to be both short and long volatility as market conditions changed—a portfolio construction that necessarily required stringent risk management policies and protocols to ensure that the strategy worked as required by the contracts and other representations that defined Allianz's duties.  To do so consistent with the Alpha Fund's investment mandate, Allianz

purportedly performed "tail-risk protection, risk reduction, and/or volatility smoothing" based on "analysis of historical movements of broad-based US indexes, as well as rigorous scenario testing," and was required to stress test the portfolio under the very kinds of market conditions that occurred in February and March 2020.

10.     These extensive risk control measures were overseen and enforced by the Allianz Global Investors Defendants, and AllianzGI's parent, Allianz SE.  For example, the lead portfolio manager for the Structured Alpha Funds, Greg Tournant ("Tournant"), told investors that Allianz's supposedly rigorous and conservative management of the Alpha Funds was enforced and backstopped by the global business comprised of the Allianz Global Investors and its parent, Allianz SE.  As he explained, "Allianz as a parent company is also monitoring" AllianzGI's management of the Alpha Funds.  As Tournant put it, "I have behind me one of the largest and most conservative insurance companies in the world monitoring every position that I take to make sure that from a legal, compliance and risk standpoint that I'm well within guidelines."  According to Tournant, Allianz SE was a "master cop" that closely monitored the Structured Alpha Funds' "every single move."

11.     Under that oversight, Allianz told investors that it had prepared the Alpha Funds for "highly unlikely 'what if' scenarios" by "developing mathematically pre-established portfolio actions in the event of a major statistical disruption" through continual, "[r]igorous scenario testing."  Indeed, at the end of 2019, AllianzGI told investors that it was "as prepared as ever in the event of a severe market dislocation."  Referring to a "violent correction and volatility surge" that had occurred in February 2018, Allianz said that "Structured Alpha's option portfolio is positioned for a strong improvement in the event of another February 2018-type move."  Unfortunately for the ERP, this was clearly not the case as the Alpha 500 Fund began incurring

losses just seven weeks later in February 2020. Had AllianzGI actually run and adhered to the stress test protocols that it was required to follow, the Fund's exposure to the market conditions in February and March 2020 would have been readily apparent, and their losses averted.

12.     Instead, Allianz violated their duties and the Fund's core investment mandate, triggering losses during February 2020, with the Alpha 500 declining by more than 19% for February of 2020 and underperforming its benchmark by nearly 10%.   The Fund's underperformance relative to its benchmark is highly significant because the investment mandate called for AllianzGI to use the "alpha" component of the Fund's portfolios to outperform its benchmark irrespective of dislocations in the equities markets.   AllianzGI could have taken protective actions following the February market decline by exiting the options positions that would have generated further losses if the equity markets declined or volatility increased. However, those measures would have realized the losses that began to be incurred in February. But because incurring those losses would have made it extremely difficult for the Alpha 500 to ever re-achieve returns above its respective index benchmark—which AllianzGI needed to obtain before it could receive any future fees for managing the Alpha Fund—AllianzGI acted in its own self-interest and further breached its obligations by positioning the Fund in a manner contrary to its investment mandate and which exposed investors to extreme risk.

13.     Specifically, in February 2020, as investor concerns over the impact of the coronavirus began reverberating through the markets, AllianzGI positioned the Alpha Funds such that they were indisputably "short" volatility—meaning that the Alpha Funds would suffer losses if market volatility increased—and exposed the Alpha Funds to catastrophic losses in the event of a market downturn.   Many investors, recognizing the risk that current economic and market conditions would cause volatility to increase, sought to *buy* protection against volatility.   The

pricing of volatility protection reflected the overall consensus among investors that volatility would increase significantly in the short-term.  That demand for volatility protection caused the premiums associated with *selling* volatility protection to increase.  The increase in the premiums associated with selling protection against volatility allowed AllianzGI to sell options to other investors at increased premiums, seeking to "recoup" losses suffered by the Funds in February 2020—but which dramatically increased losses when volatility predictably continued to increase.  This strategy conflicted with the Alpha 500's stated mandate, and AllianzGI's duty to the ERP, of maintaining market neutrality.  It similarly represented a severe breach of the express fiduciary duties AllianzGI had to the ERP.

14.     In addition to positioning the Alpha 500's portfolio so that it was in no way "market neutral" by the end of February 2020, Allianz also lacked any meaningful hedging positions whatsoever—the positions that were supposed to be the "cornerstone" of its risk management strategy.  This is because, by the end of February 2020, the hedging positions that were ostensibly intended to protect the Fund against a market downturn would only begin to take effect (and generate returns to provide "protection" to the portfolio) after the Fund had already lost 30-40% of its value.  In fact, many of the "hedging" put options in the Alpha Funds' portfolios were quoted in the market with no bids and an "ask" of $0.05, reflecting investors' view and the reality that these supposed positions were virtually worthless.

15.     As a result, the Alpha Funds were effectively "naked" short volatility—without any downside protection whatsoever—and betting volatility would subside at the very time it was rapidly increasing.  Specifically, while the Chicago Board of Exchange ("CBOE") Volatility Index ("VIX") was swiftly rising, AllianzGI made a risky attempt to profit by selling volatility protection

to investors.[1]  These positions would generate positive results if volatility decreased.  In other words, AllianzGI was effectively selling expensive insurance to other investors seeking to protect themselves from large market swings.  This strategy—undertaken with the assets of the ERP in the Alpha 500—was a gamble that the expected market tsunami would turn out to be a drizzle.  As of February 29, 2020, the Alpha Funds were almost exclusively short naked VIX-traded calls (these positions would generate gains only if the markets stabilized and would generate losses if the markets continued to be volatile).  Critically, when viewed in terms of AllianzGI's investment mandate to provide downside protection and employ a strategy to outperform benchmarks regardless of the direction of equity prices, AllianzGI's decision to bet against volatility exposed the Alpha Funds to significant losses in the very scenario that the Alpha Funds should have been protected against.

16.     In March 2020, as Allianz economists had predicted, investor uncertainty concerning the economic impact of the coronavirus triggered substantial (but hardly unprecedented) market volatility and prompted sharp declines in equity prices—and the Alpha Funds began to suffer extraordinary losses resulting from the volatility protection Allianz had sold to other investors.  And, rather than take measures to stem those losses, Allianz continued to "double down" on its bet against volatility in a self-interested move to save Allianz's own management fees.  Specifically, the Alpha 500's fee structure (described further below) would have made it impossible for Allianz to earn any fees for its management of the Fund for the foreseeable

---

[1] The VIX is a measure of expected market volatility derived from the prices of options on the S&P 500 Index.  Options and futures are available on the VIX, as well as exchange-traded notes such as the VXX. These contracts are designed to track short-term volatility movements.  The Funds had sold short VXX call options, which positions would only appreciate as volatility declined.

future if the losses experienced in February were not recovered by the end of March.  Faced with these realities and motivated by self-interest, the Allianz Defendants risked client assets to recover these short-term losses—but only exacerbated the losses they had already caused the Funds to incur.

17.    Seeing the losses mount in the Alpha Funds' portfolios' volatility-based positions during March 2020, AllianzGI's desperation led it to manipulate the settlement price of VIX futures on March 18, 2020 in an effort to mitigate the losses the Alpha Funds were poised to incur on the settlement price of VIX futures contracts expiring that day.

18.    But by the end of March, first quarter 2020 returns for the Alpha Funds had suffered catastrophic losses and severely underperformed returns for the benchmark indexes.  Specifically, first quarter 2020 returns were -75.52% for Alpha 500 as compared to -19.60% for the S&P 500 Index, the Alpha 500's underlying "benchmark" index.  The Alpha 500 also significantly underperformed compared to funds with comparable investments strategies in this period, demonstrating that these losses were the result of AllianzGI's breaches rather than general market conditions.  On March 25, 2020, AllianzGI announced that it was liquidating the Structured Alpha 1000 and Structured Alpha 1000 Plus Funds because of insurmountable losses.  Analysts and consultants quickly began to downgrade AllianzGI's Structured Alpha Funds as a result of AllianzGI's imprudence and disastrous risk management during the downturn.

19.    As a result of AllianzGI's breaches, between January 1, 2020 and March 27, 2020, the ERP lost nearly $150 million on its investments in the Alpha 500.  On May 1, 2020, the ERP filed a notice of redemption to withdraw all of its remaining investment from Alpha 500 on the next redemption date, June 10, 2020.  Through this action, the Plan seeks to recover the damages caused by AllianzGI's negligence and breaches of its contractual and fiduciary duties to the ERP.

## II.    PARTIES

### A.    Plaintiffs

20.    Plaintiff ERP is a multiple employer defined benefit plan sponsored by the Conference of Major Superiors of Christian Brothers to serve as a retirement vehicle for participating organizations that are part of the Roman Catholic Church, for employees of such organizations and dioceses.  Christian Brothers Services, which is the Administrator of the ERP, is a non-profit corporation and has its principal place of business at 1205 Windham Parkway, Romeoville, IL 60449.  The ERP invested in Alpha 500 pursuant to the contracts and agreements described below between it and AllianzGI.

21.    Plaintiff Dan Stremel is the Chairperson for the Pension Board, which is the governing body for ERP.  Plaintiff Stremel is a resident of the State of Kansas.  The Pension Board has duly authorized the commencement of this action by and through the ERP and Stremel.

### B.    Defendants

22.    Defendant Allianz Global Investors U.S. LLC ("AllianzGI") is a Delaware limited liability company and registered investment adviser with its principal place of business at 1633 Broadway, New York, New York.  AllianzGI is a direct, wholly-owned subsidiary of Allianz Global Investors U.S. Holdings LLC (defined below).  AllianzGI is the investment manager for the Alpha Funds.

23.    Defendant Allianz Global Investors U.S. Holdings LLC ("AllianzGI Holdings") is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York.  AllianzGI Holdings is the direct, 100% owner and sole member of AllianzGI.

24.    Defendant Allianz Asset Management of America L.P. ("AAMA LP") is a Delaware limited partnership with its principal place of business in Newport Beach, California.  AAMA LP is the direct, 100% owner and sole member of AllianzGI Holdings.

25.     Defendant Allianz Asset Management of America LLC ("AAMA LLC") is the sole general partner of AAMA LP and is a Delaware limited partnership with its principal place of business in Newport Beach, California.

26.     Defendant PFP Holdings Inc. ("PFP"), a limited partner of AAMA LP, is incorporated in Delaware and has its principal place of business in Petaluma, California.

27.     Defendant Allianz Asset Management of America Holdings Inc. ("AAMA Holdings") is a Delaware corporation with its principal place of business in Newport Beach, California.  AAMA Holdings holds a 0.1% managing interest in AAMA LLC.

28.     Defendants AllianzGI, AllianzGI Holdings, AAMA LP, AAMA LLC, PFP, AAMA LLC, and AAMA Holdings are part of what the Allianz Defendants branded the "Allianz Global Investors"—Allianz Group's global asset management business—and are sometimes referred to collectively herein as the "AGI Defendants."

29.     Defendant Allianz of America Inc. ("Allianz of America") is a Delaware corporation with its principal place of business in Petaluma, California that holds a 99.8% non-managing interest in AAMA LLC.  Allianz of America is a wholly-owned indirect subsidiary of Allianz SE.

30.     Defendant Allianz Asset Management GmbH ("AAM GmbH") is incorporated and headquartered in Munich, Germany and is the asset management division of Allianz SE.  AAM GmbH is the direct, 100% owner of AAMA Holdings and holds a 0.1% non-managing interest in AAMA LLC.  In 2019, Allianz SE reported €7.164 billion in operating revenue from the Allianz Asset Management business organized under AAM GmbH, substantially including revenues derived from AAM GmbH's activities and interests in managing the Alpha Funds through the operation of Allianz Global Investors, which AAM GmbH controlled at all times relevant hereto.

Given AAM GmbH's control and management of Allianz Global Investors, AAM GmbH was responsible for the sale, marketing, operation and risk management of the Alpha 500 sold to the ERP.

31.     Defendant Allianz SE is a multinational insurance and financial services holding company incorporated and headquartered in Germany that provides asset management services to 82 million clients in over 70 countries.  Allianz SE refers to itself and its subsidiaries as the "Allianz Group."  Allianz SE holds a direct ownership interest of at least 75% in AAM GmbH and an indirect, 100% interest in Allianz of America.  According to the Allianz SE Statutes, or articles of incorporation, Allianz SE's "corporate purpose" is "the direction of an international group of companies, which is active in the areas of insurance, banking, asset management, and other financial, consulting, and similar services."  Allianz SE, through its control over Allianz Global Investors, engaged in substantial management and business activities associated with the sale, distribution, supervision and risk management of the Alpha Funds, as marketed and sold to the ERP.

32.     A chart reflecting the citizenship of and corporate relationships among the Allianz Defendants is attached hereto as Appendix A.

33.     The personnel and operational overlap of the above Allianz Defendants establishes the principal-agency relationship between each entity and AllianzGI, which is also evidenced by their shared ownership, shared directors and officers, and a unilateral reporting structure.  For example, AllianzGI's sole and direct corporate parent, AllianzGI Holdings, shares numerous overlapping directors and executives, as well as the same business address and phone number with AllianzGI.  Specifically, Gemesh Pushpaharan is both the COO and Managing Director of AllianzGI, and a member of the Executive Committee of AllianzGI Holdings.  Paul Koo is both

the Chief Compliance Officer of AllianzGI and a director of AllianzGI Holdings.  As such, he executed AllianzGI's Forms 13G filed with the SEC on behalf of both AllianzGI and AllianzGI Holdings.

34. Further, numerous individuals held director or managing director positions at both AllianzGI and AllianzGI Holdings: Barbara Claussen, John Carroll; David Jobson; Erin Bengtson-Olivieri, Christopher Cieri, Joseph Quirk, Steven Ricci, Frank Garofalo, Bruce Goodman, David Hood, Douglas Forsyth, Peter Bonanno, and Joseph Scull.

35. Further establishing the chain of control among these entities, AllianzGI, AllianzGI Holdings, AAMA LP, AAMA LLC, AAMA Holdings, and PFP, under current and prior entity names, have had shared directors and officers, including:

- John Maney: COO and Managing Director of AAMA LP and AAMA LLC, and Managing Director of AllianzGI.

- James Funaro: Senior Vice President of AllianzGI, AAMA LP, AAMA LLC, AAMA Holdings, and AllianzGI Holdings, and SVP of Tax Matters for PFP.

- Tony Burg: Senior Vice President and Treasurer of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and AllianzGI Holdings.

- Kellie Davidson: Secretary of AllianzGI, AAMA LLC and AAMA LP; Assistant Secretary of AAMA Holdings, AllianzGI Holdings.

- Tucker Fitzpatrick: Senior Vice President and Secretary of AAMA Holdings; Senior Vice President and General Counsel of AAMA LP, Assistant Secretary of AllianzGI Holdings and Allianz GI.

- Michael Puntoriero: CFO of AAMA Holdings, AllianzGI Holdings; Managing Director and CFO of AllianzGI, AAMA LLC, AAMA LP and PFP.

- Vinh Nguyen: Senior Vice President and Treasurer of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and PFP.

- Colleen Martin: SVP and Controller of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and PFP.

- John Viggiano:  Managing Director and U.S. General Counsel with Allianz Global Investors, and who previously served as Chief Risk Officer, Head of Compliance and Regulatory Counsel for AAM GmbH.

36.     The positions held by these individuals in various subsidiaries within Allianz Group, including AllianzGI, are summarized in the chart below:

| | AllianzGI | AllianzGI Holdings | AAMA LP | AAMA LLC | AAMA Holdings | PFP Holdings | AAM GmbH |
|---|---|---|---|---|---|---|---|
| John Maney | X | | X | X | | | |
| James Funaro | X | X | X | X | X | X | |
| Tony Burg | X | X | X | X | X | | |
| Kellie Davidson | X | X | X | X | X | | |
| Tucker Fitzpatrick | X | X | X | | X | | |
| Michael Puntoriero | X | X | X | X | X | X | |
| Vinh Nguyen | X | | X | X | X | X | |
| Colleen Martin | X | | X | X | X | X | |
| John Viggiano | X | | | | | | X |

37.     These overlapping relationships among the Allianz Defendants' employees, officers and directors are consistent with Allianz Global Investors' branding and representations to investors.  Indeed, Allianz SE's corporate filings also illustrate the important role the ultimate parent company—Allianz SE—plays in establishing and enforcing the risk framework and procedures that failed in the case of the Alpha Funds.  For example, Allianz SE's Board of Directors is charged with "setting business objectives and the strategic direction, for coordinating and supervising the operating entities, and for implementing and overseeing an efficient risk management system," including "risk controlling processes" set by the Board that required "regular reporting to [Allianz] Group."  Board members of both Allianz SE and the Allianz Group sat on a "Group Investment Committee" responsible for "implementing the Group investment strategy, including monitoring group-wide investment activities" and "approving investment-

related frameworks and guidelines[.]"   According to those filings, Allianz Group runs its "operating entities"—including the Defendant subsidiaries here that comprise its asset management division—"via an integrated management and control process," which includes Allianz Group reviewing the operating entities' "business strategies and goals."   And as the lead portfolio manager for the Alpha Funds explained to investors, Allianz SE was a "master cop" that was "monitoring every position that I take to make sure that from a legal, compliance, and risk that I'm well within guidelines."

38.     Allianz SE acknowledges that it exercises controlling power over each of the other Allianz Defendants and relies on their business activities in assessing its own solvency under applicable European insurance regulations.   Specifically, according to Allianz Group's 2019 Solvency and Financial Condition Report, Allianz SE exercises a "dominant" influence over, has 100% voting rights in and capital share with, and uses 100% of the financials for the establishment of Allianz Group's consolidated accounts and solvency calculation of each of Defendants AllianzGI, AllianzGI Holdings, AAMA LP, PFP, AAMA LLC, AAMA Holdings, and AAM GmbH—confirming the ultimate control Allianz SE exerts over the AGI Defendants.

## III.     JURISDICTION AND VENUE

39.     This Court has jurisdiction over the cause of action asserted in this Complaint pursuant to 28 U.S.C. § 1332(a)(3) (diversity of citizenship) because the dispute is between citizens of Illinois, Kansas and citizens of different U.S. states and of Germany, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

40.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the parties consented to submit to the jurisdiction of the courts of the State of New York in the county of New York "in the event of any dispute arising out of the terms and conditions" of the Agreements (defined below) governing the ERP's investments in the Alpha 500.   In addition,

actions that AllianzGI and the other Allianz Defendants undertook in managing the Alpha Funds occurred in the New York, New York headquarters of AllianzGI, in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Background of the Allianz Global Investors Enterprise

41.    Allianz solicited investments in the Alpha Funds based on the proclaimed ability to provide attractive investment opportunities and consistent returns protected by Allianz SE's purportedly sophisticated risk management.   Branded as "Allianz Global Investors"—the marketing name for the Allianz Group's global asset management business—Allianz presented itself as a single unitary enterprise, under the leadership of its corporate holding parent Defendant Allianz SE, that operated on a coordinated basis throughout the world.

42.    As explained in marketing materials on its website and presented to investors, Allianz Global Investors repeatedly highlighted the benefits of its relationship with Allianz SE and its reputation for superior risk management and track record.  For example, Tournant told investors that it would never "swing for the fences" with the Alpha Funds because he had Allianz as a "master cop" "monitoring every position that I take to make sure that from a legal, compliance, and risk standpoint that I'm well within guidelines."  Allianz Global Investors claimed that its "ability to manage risk for investors is a direct reflection of our own business" at AllianzGI's parent company—Allianz SE—"where we practice the highest standards of enterprise risk management." Similarly, Allianz Global Investors touted in marketing materials that it is a "globally integrated investment manager" that "has a strong parent with a track record of strategic investment for the long term."

43.    Further reinforcing the notion that investors could rely on the "rock-solid risk management" and benefits of that global enterprise, Allianz Global Investors presents its investment performance and assets under management in marketing materials as the combined

activities of the Allianz Defendants named herein.  Allianz Global Investors defined itself as a group of entities that "coordinate their research, investment and/or trading activities" qualifying as a "firm" under the Global Investment Performance Standards ("GIPS"), a set of international standards governing the disclosure and representation of investment performance results.  Doing so enabled Allianz Global Investors to advertise to investors that they would benefit from the strength and stability of over 760 investment professionals in 25 offices worldwide and management of over USD 604 billion in assets.  As explained in marketing materials, Allianz Global Investors' "global investment platform brings together professionals from across asset classes and investment styles, enabling them to collaborate to generate unique insights for clients while maintaining distinct investment processes."

44.     The ability to draw from the experience, risk management expertise and asset base of the global Allianz Global Investment platform and Allianz SE was a core feature of the Alpha Funds investment proposition.  For example, in presenting the Structured Alpha Funds to investors, Allianz Global Investors representatives made clear that the unified Allianz enterprise was responsible for the Structured Alpha Funds, explaining that "Allianz is a large international insurance company based in Germany and we are also one of the world's largest asset managers and we have approximately half a trillion dollars in assets worldwide."  In fact, Deborah Zurkow ("Zurkow"), the Global Head of Investments at Allianz Global Investors, said one of the benefits of investing in liquid alternatives (like the Alpha Funds) through Allianz was that Allianz Global Investors' broad scale and asset base provided protection during times of financial turmoil.  As Zurkow explained, Allianz Global Investors has "an entrepreneurial culture that sits inside a stable parent"—a particularly "important" feature in alternatives given "investors' concern that the smaller hedge funds or alternatives teams won't be able to maintain the kind of counter-party

liquidity required if we hit a crisis."  By suggesting that Allianz Global Investors, and its ultimate parent, Allianz SE, would step in to support the Funds in the event of "counter-party" illiquidity, the Allianz Defendants sought to market the Funds not only based on the skills and resources of Allianz Global Investors but more specifically based on the capital and liquidity support the Allianz Defendants could collectively provide.

45.     Tracking these representations, AllianzGI's SEC filings state that AllianzGI coordinates its activities with the Allianz Global Investors affiliates, each of which is also a directly or indirectly a wholly-owned subsidiary of Allianz SE.  For example, those filings explain that AllianzGI shares employees with and provides other services to the Allianz Global Investors affiliates (including the AGI Defendants) and similarly receives services in return, including in legal and compliance, risk management, human resources, finance, information technology, trade support and sales and marketing.  In addition, AAMA LP, the direct parent company and 100% owner of AllianzGI Holdings (the direct parent of AllianzGI), provides technology, business systems, human resources, legal and finance to AllianzGI.  Similarly, AAMA LLC, the sole general partner of AAMA LP, shares a business address and phone number with AAMA LP.  Employees, directors and officers of AllianzGI, AllianzGI Holdings, AAMA LP, and AMMA LLC are subject to discipline under a common Code of Business Conduct and Code of Ethics.

46.     In fact, rather than a mere marketing name, Allianz Global Investors has its own "Global Executive Committee," "Global Investment Management Committee," and "executive leadership team" that manages and oversees the activities of the Allianz Global Investors entities. Those executives include CEO Tobias Pross ("Pross"), Global Chief Operating Officer Karen Prooth, Zurkow, and Global Head of Projects, Operations and Technology Alexandra Auer, who was recently promoted from her position as COO of Defendant AAM GmbH.

18

47.     The actual management and oversight of the Alpha Funds, as well as the interrelationships between the related AGI Defendants here, followed the unified "global entity" Allianz described to investors.  The portfolio managers responsible for the Alpha Funds—Greg Tournant, Stephen G. Bond-Nelson, and Trevor L. Taylor—are Managing Directors at AllianzGI. Tournant, in turn, reports to Zurkow, Global Head of Investments at Allianz Global Investors, who is employed by Allianz Global Investors GmbH, UK Branch, an affiliate of AllianzGI.  Zurkow is specifically identified as an "associated person" of AllianzGI under the Investment Adviser Act of 1940 in AllianzGI's Form ADV filing.  Chris Grix, Allianz Global Investors' U.S. Head of Risk, who reports to Wolfram Peters, Allianz Global Investors' Global Head of Risk, were both involved in overseeing the Alpha Fund's performance in February and March 2020.

48.     Following the disastrous performance of the Alpha Funds in February and March of 2020, Allianz Global Investors announced that Douglas Eu, CEO of AllianzGI and a key official responsible for oversight of the Alpha Funds, would be leaving the firm on June 30 after 14 years with Allianz, including as the U.S. CEO of Allianz Global Investors GmbH.  In connection with Eu's departure, Allianz installed Malie Conway, moving her from her role as Chief Investment Officer of Global Fixed Income Strategies in London to be the head of Allianz Global Investors' U.S. distribution operations in New York.  She will report to Pross, the global CEO of Allianz Global Investors in London.  Allianz disclosed that it will not appoint a new AllianzGI CEO to replace Douglas Eu.

### B.     AllianzGI's Duties to the ERP and the Alpha 500's Mandate

49.     The ERP first invested in the Alpha 500 in December 2016, and AllianzGI—the investment manager for the Alpha Funds—acted as a fiduciary to the ERP in connection with its investment in the Alpha 500.  The Alpha 500 was governed by several documents, the most recent documents being the Fifth Amended and Restated Limited Liability Company Agreement of

AllianzGI Structured Alpha U.S. Equity 500 LLC, dated December 31, 2017 ("the LLC Agreement"), the AllianzGI Structured Alpha U.S. Equity 500 LLC Confidential Private Placement Memorandum, effective December 31, 2017 (the "PPM"), and the Allianz Structured Alpha U.S. Equity 500 LLC Subscription Agreement dated January 2015 (the "Subscription Agreement", and collectively with the LLC Agreement and PPM, the "Agreements").

50.     AllianzGI is the Managing Member of the Alpha 500 and is responsible for the general management of the Alpha 500, with a focus on active management.

51.     AllianzGI purported to operate the Alpha Funds with a specific investment objective: to outperform each Alpha Fund's respective benchmark index by a certain number of basis points, or one hundredth of one percent.  AllianzGI and Allianz Global Investors intended to achieve the investment objectives of the Structured Alpha Funds through active management of an options overlay strategy.

52.     In its effort to achieve these objectives, AllianzGI represented that the Alpha 500 invested in both a "beta" and an "alpha" options component.  The options "alpha" component for the Alpha 500 was designed to generate "[a]bsolute return in any environment" with the "ability to benefit from high volatility."  The alpha component specifically consisted of investments in puts and calls on major equity indexes such as the S&P 500 Index as well as options directly on the VIX using a proprietary model to construct the option spreads.  The alpha component purportedly employed a diversified options overlay strategy using three core trades, as described further below.  Allianz explained that the "plus" of its Structured Alpha Funds was a reference to the options component and that it provided resilience through an inverse correlation to the equities market, with the expectation that over time, that there would be "low or no correlation to other asset classes."

53.     The Alpha 500's investment objective was to outperform the S&P 500 Index by approximately 750 basis points, or 7.5% gross of fees and expenses.  Reducing the net return to investors by the incentive allocation and expenses for Alpha 500, AllianzGI expected to outperform the S&P 500 Index by approximately 5%, or 500 basis points.

54.     The beta component consisted of a futures trading program, cash investments, ETFs, equity swaps or securities to achieve broad exposure to the S&P 500 Index.  The alpha component used the same "proprietary model" and three core trades described below to generate returns.

55.     Further, because there was "no borrowing" or added leverage, the ERP's investment in the Alpha 500 supposedly was protected and not significantly riskier than an investment in securities tracking the S&P 500.

56.     Through their alpha components, the Structured Alpha Funds were purportedly structured to be uncorrelated with the direction of equities and volatility and to be "long and short volatility at the same time, at all times," *i.e.*, market-neutral; "protect[ed] against a market crash," "prepare for the unexpected; pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses," and subject to significant risk management through "proprietary scenario and stress testing models," monitoring equity index behavior and bid-ask spreads, scenario and stress testing, and firm-level independent oversight by Allianz Global Investors.  In sum, AllianzGI's option overlay strategy purportedly aimed to capture volatility premiums and deliver consistent absolute returns that were not dependent on the direction of equity markets, while also offering tail protection against large market declines.

57.     AllianzGI's head portfolio manager, Tournant, described AllianzGI's options strategy as akin to selling insurance, where a premium is paid for the rights provided by the option

and a premium is collected to provide that right.  While the strategy would earn a net premium from selling both put and call options, the portfolio was stated to always hold more long put option contracts relative to the number of put options sold.  By doing so, AllianzGI purportedly protected against downside exposure in a tail risk event or significant market decline, as AllianzGI would be able to exercise or sell those positions in a declining price environment.

58.    Option values are directly affected by the expected volatility of the underlying asset.  The values of both put and call options increase as the expected volatility of the underlying asset increases.  Thus, the price of the "insurance" that AllianzGI was selling to the markets through its options trading would increase as expected market volatility increased.  When expected market volatility went up, the Funds would make money on its long positions in equity index options and lose money on its short positions.[2]  Thus, when volatility was high, AllianzGI could potentially make more money by selling options, while the cost of the options it purchased to hedge its exposure would be higher.

59.    In executing its alpha options overlay strategy, AllianzGI implemented three types of trades through combinations of option positions that were meant to complement each other: the range-bound spread trades, the directional spread trades, and hedges.  The range-bound spread, the type of trade that historically generated two-thirds of the Alpha Funds' excess returns, included combinations of options positions that would make money if the underlying asset stayed in a particular range but would lose money if the price of the underlying asset landed outside the

---

[2] The "long" side of an option position is the buyer of the option who has paid for the right but not the obligation to exercise the option.  The "short" side of the option is the seller who has sold the right and who must complete the agreed upon transaction if and only if the long side chooses to exercise.  One can think of the short side as the seller of insurance against a particular event happening (*e.g.*, the price of the underlying asset dropping), and who gets to keep the premium if the event does not happen.

range.  This can be thought of as similar to selling insurance against the price of the underlying asset landing outside the range. If the market remained stable, AllianzGI could sell protection against upside or downside "tail risk"—the possibility that the market could go up or down by an extreme amount—without having to pay anything out.

60.     The directional spread strategy—which was intended to be a diversifier that provided returns when the market behaved unusually is the opposite of the range-bound spread. The directional spread strategy historically generated the remaining one-third of the Alpha Funds' excess returns and also to mitigate the risk of the range bound spread trades.  A directional trade is a bet that the underlying asset will move in a particular direction.  The directional spread trade would generate positive returns if asset prices moved in one direction or the other.  AllianzGI's directional spread trades, had they been in place, should have provided protection to the Funds and yielded significant returns during the volatile market conditions in February and March 2020.

61.     Finally, AllianzGI purportedly maintained a constant hedge against large equity market sell-offs by holding long, out-of-the-money puts which—AllianzGI claimed—would protect against any sudden market declines.  Critically, the primary objective of these hedging positions was to "protect the portfolio in the event of a market crash."

62.     In establishing these three trading positions, AllianzGI traded in options on major equity indexes, and took positions on volatility using options on volatility products such as the VIX Index.  If the VIX goes up (meaning investors expect more volatility), a call option on the VIX would increase in value and a put option would lose value.  If the VIX goes down (meaning investors expect less volatility), a call option on the VIX would lose value and a put option would gain value.  AllianzGI also took short calls on exchange-traded notes such as the VXX, an option

with returns based on the S&P 500 VIX Short-Term Futures Index Total Return and is essentially a derivative note built on top of the VIX.

63.     This three-part approach was to be effectively market-neutral and "agnostic to implied levels of volatility." AllianzGI emphasized that it was "[p]ositioned for all market environments" and "able to weather different market environments due to the continual optimization of [these] three types of building blocks," which aimed to provide "consistent, uncorrelated returns regardless of the direction of equities and volatility." Further to that point, Allianz Global Investors represented that the Alpha 500 had the "[a]bility to perform whether equity markets are up or down, smooth or volatile."

64.     Allianz emphasized the Alpha Funds' portfolios' positioning and ability to weather high volatility environments in direct communications with the ERP. Allianz told the ERP that the Structured Alpha strategy and positioning by the portfolio management team enabled the Funds to perform well during the significant spike in volatility in February 2018—referred to "Volmageddon"—which Allianz Global Investors Senior Relationship Manager Michele Cameron and Managing Director and product specialist Jeff Sharan referred to as "an excellent liquidity stress test for our portfolio" in directly responding to concerns the ERP had raised concerning the liquidity of the Alpha Funds' positions in stressed environments. Cameron also stated "[b]y virtue of the fact we trade options only on broad U.S. equity indexes such as the S&P 500, we have ample liquidity whenever we need to trade."

65.     For example, referring to the Funds' performance in early February 2018, Cameron and Sheran emphasized the portfolio management team's ability to "mov[e] a large number of options contracts during a period of market distress," and "with normal execution, normal bid-ask spreads and no operational impediments." Allianz similarly informed the ERP that February 2018

had "reaffirmed that our capacity limits, as well as the ongoing risk-management dialogue we maintain with our counterparties, have had the desired effect in preserving our ability to successfully implement our investment process even during periods of market instability." And in a presentation to the ERP in May 2018, Allianz highlighted the Structured Alpha Funds' performance during the first quarter of 2018 as demonstrating the "strategy's rigorous risk management, essential combination of short and long volatility, and overall resilience" that had enabled the Funds to "limit the damage from this most recent market storm."

66.     Reiterating the investment's core premise and tie to the unified Allianz enterprise, in marketing materials and other communications with investors, AllianzGI characterized the Structured Alpha Funds' approach as a "confident strategy with an insurance spirit," saying "[t]his focus on reliable returns [was] demonstrative of Allianz's business as a whole—as both an asset manager and an insurer." However, as noted above, and described further below, during February and March 2020—when the Funds were highly sensitive to market volatility—they were positioned contrary to the Funds' investment mandate, short volatility during a time of extreme volatility in the markets, and lacked adequate hedging to protect against market downturns.

C.     **AllianzGI's Duties to the ERP Included Ensuring That the Alpha 500 Was Adequately Hedged to Protect Investors Against Downside Risk**

67.     AllianzGI described risk management as a core feature of the Structured Alpha investment strategy. Specifically, AllianzGI claimed that the Alpha 500's investment objective was to "protect against a market crash." The Alpha 500 purportedly held long, out-of-the-money puts to protect against a "short-term equity-market crash," which Allianz "[d]efined as a decline of 10% to 15% in less than 5 days." A long, out-of-the-money put is, essentially, catastrophe insurance that protects an investment against dramatic downward price moves in the market.

68.     AllianzGI described these hedging positions as protecting the portfolio from an overnight crash by purchasing put options in a greater quantity than sold, with approximately "30% to 50% more long puts than short at all times," and the puts would be "laddered [for] various market outcomes to the downside" with strike distances from -10% to -25%.   Thus, AllianzGI's purported risk management process ensured that certain option positions were always in place as protection, which created a floor against significant market declines.   In fact, AllianzGI represented that it spent at least 100 basis points on hedging during periods of low volatility, 130-150 basis points during periods of medium volatility, and 170-200 basis points during periods of high volatility—assuring the ERP that the hedges provided meaningful protection to the portfolio.

69.     In fact, in a document provided by Allianz's Michele Cameron in a May 22, 2018 email to the ERP, Allianz explained that the Structured Alpha Funds' hedging positions eliminated the possibility of a margin call.   Specifically, Allianz represented, "[a]n ill-timed margin call can be highly problematic for some option strategies.   We do not have this risk because our hedging positions—deep out-of-the-money long puts that are always in place—actually cause our margin requirement to decrease the further the market declines.   This is a key benefit of our hedging positions."

70.     AllianzGI also purported to protect against losses by employing "tail-risk hedging positions" that were "embedded in the portfolio at all times," having "independent risk-oversight professionals monitor trade activity and risk profiles daily," and providing "real-time risk monitoring, as well as analysis of statistically significant equity-market scenarios."   AllianzGI also claimed that risk was continuously managed and monitored at both the portfolio level by the investment team and the firm level by an independent risk management group.

71.     At the portfolio level, AllianzGI purported to utilize real-time risk management and monitoring based on statistical equity index behavior; proprietary scenario and stress testing models; and consistent monitoring of bid-ask spreads for options to ensure execution.  Structured Alpha materials stated that:

> [O]ne of the most unique characteristics of our approach is the combination of both long- and short-volatility positions at all times.  The option portfolio seeks to capitalize on the return-generating features of selling options (short volatility) while simultaneously benefiting from the risk-management attributes associated with buying options (long volatility) and to continually optimize the balance between these two types of exposures.

72.     The Allianz Defendants purported to regularly evaluate portfolio and counterparty risk, business risk, operational risk, and reputational risk.  AllianzGI said it engaged an external, independent risk management service provider to provide analysis and reporting services, Allianz SE subsidiary IDS GmbH.  Allianz claimed that IDS GmbH supported Allianz Global Investors' "Independent Enterprise Risk Management" function, which monitors the Alpha Funds' "daily trade activity and weekly risk profiles to check for any significant shifts in the portfolios."  That function purportedly performed an extensive scenario analyses to ensure that "all portfolios' style and construction are within guidelines," with risk controls including:

- at least 31 stress tests that measured contribution to risk by index product;

- GARCH estimates of risk;[3]

- Value at Risk ("VaR") and expected shortfall;

- Delta, Gamma, and Vega analysis; and

- analysis of performance statistics.

---

[3] Or Generalized Autoregressive Conditional "Heteroskedasticity."  The GARCH model is a statistical model that captures features such as volatility clustering for downside risk evaluation.

73.     Materials provided to the ERP outline the various layers of risk control protections at both the firm level and the portfolio level for the Alpha 500 as follows:

**Firm-level**

- Evaluates and monitors **portfolio and counterparty risk, business risk, operational risk,** and **reputational risk**

- **Independent Enterprise Risk Management function** responsible for independent portfolio risk oversight monitors daily trade activity and weekly risk profiles

- **Supported by IDS GmbH - Analysis and Reporting Services (IDS),** an independent service provider

- **Evaluates:**
  - VaR and expected shortfall
  - 31 stress tests, contribution to risk by index product
  - GARCH estimates of risk
  - Delta, Gamma, and Vega analysis
  - Analysis of performance statistics

**Portfolio-level**

- **Real-time risk management and monitoring** based on statistical equity index behavior

- **Proprietary scenario and stress testing** models

- **Monitoring of bid-ask spreads** for options to ensure that our restructuring discipline is executable

74.     Tournant spoke at length in a May 2016 interview, featured on AllianzGI's website, about the risk-mitigating features purportedly inherent in AllianzGI's investment strategies for Allianz's Structured Alpha Funds.   When asked about the risk-management strategy for the Structured Alpha Funds, Tournant said, "The way we construct the strategy is we have a wide range of positions.   Some positions are designed to make money if the market goes up, some will make money if the market goes down and some will make money if the market is in range bound. They exist in the portfolio all the time so therefore our objective is never to guess the direction of the market, not be dependent on the direction of the market, and hopefully we have a statistical outcome that will allow us to generate profits regardless of market directions."

75.     Analogizing the Structured Alpha Funds' strategies to the functioning of an insurance company that would have to pay out only when there is a "catastrophic event," Tournant continued, "I would also add the fact that given the positions that we buy to protect ourselves against those catastrophic shocks, those kinds of risk insurance positions, that you could label those as reinsurance."   That is, even if a large market downturn were to occur, Tournant explained that

the Structured Alpha Funds had "risk insurance positions" that would "***further protect [the]***
***portfolio*** and business."

76.     Tournant reiterated the portfolio's "market neutral" strategy in an October 2015
video presentation, telling investors that the Alpha Funds were able to generate "consistent returns
over the past ten years" and performed well "regardless of market conditions," as the positions
were designed to generate returns whether the market was "up, flat or down." For example,
Tournant explained that prudent, active management of the portfolio enabled the Structured Alpha
Funds to "weather the [recent] storm" following a substantial "increase in market volatility" in
October 2015 by being "able to manage actively our profit zone."

77.     The involvement of Allianz SE and the global Allianz Global Investors enterprise
and their experienced and coordinated risk management apparatus was crucial to the Alpha Funds'
investment proposition. Tournant told investors, "I have behind me one of the largest and most
conservative insurance companies in the world monitoring every position that I take to make sure
that from a legal, compliance, and risk standpoint that I'm well within guidelines." Calling Allianz
the "master cop," Tournant reassured investors that this backing meant the Alpha Funds would
never "swing for the fences" through risky, bet-the-firm propositions.

78.     In accordance with these assurances, in assessing a fund run by the Structured
Alpha team responsible for the Alpha Funds, Morningstar analysts cited the benefits from the
"broader resources at Allianz Global Investors," including the "firm's independent risk
management function [which] oversees the structured alpha platform, monitoring daily trading
activity." According to Morningstar, the "team's disciplined focus on risk management—through
limits on leverage, perennial crash protection through put option hedges, position diversity across
expirations, and the managers' ability to adjust the risk profile during volatile markets—gives us

confidence this strategy can continue to overcome such short-term setbacks" such as those that can accompany unexpected volatility spikes. Critical to that risk management analysis was Morningstar's observation that the Structured Alpha team not only "performs a daily quantitative risk analysis, which includes a variety of stress tests" but "benefits from ***Allianz Global Investors' independent risk oversight with real-time positioning monitoring***."

> ### D. AllianzGI Abandoned Needed Risk Protections Amid Widespread Evidence of an Impending Market Downturn

79. The coronavirus began to be widely covered by major U.S. news outlets as early as January 8, 2020, with numerous reports of a developing virus that had caused dozens of people in central China to fall ill.

80. On January 21, 2020, equity prices worldwide dropped due to fears that the coronavirus outbreak could slow global economic growth. Specifically, the Dow Jones Industrial Average dropped 152.06 points, or 0.5%, to 29,196.04, its first decline in six sessions; the S&P 500 fell 8.83 points, or 0.3%, to 3,320.79; and the Nasdaq Composite lost 18.13 points, or 0.2%, to close at 9,370.80. That day, a man in Washington state was confirmed as the first case of coronavirus in the U.S.

81. By January 30, 2020, the World Health Organization (the "WHO") declared the coronavirus to be a public health emergency, a declaration based—at that point—on approximately 7,700 confirmed and 12,000 suspected cases of the virus in China alone.

82. On February 3, 2020, Mohamed El-Erian, chief economist for Allianz SE, appeared on CNBC to comment on the impact of the spread of the coronavirus. El-Erian said, "The coronavirus is different… it is big. It's going to paralyze China. It's going to cascade throughout the global economy. And, importantly, it cannot be countered…by central bank policies. So, I

think we should pay more attention to this, and we should try and resist our inclination to buy the dip."

83.     Indeed, the VIX Index, which measures the market's expectations of volatility based on the S&P 500—and which increases in a market downturn—was reaching rare highs of 40 at the end of February 2020 and leading into March 2020.

84.     As volatility in the market increased, however, throughout February and March 2020, AllianzGI made a series of investments that positioned the Fund's portfolio to generate returns if volatility *subsided*.  Specifically, as the market began to slide in February 2020, and the Alpha Funds began incurring losses, AllianzGI structured the Alpha 500's portfolios to recoup those losses, taking aggressive positions that deviated from the investment strategy and abandoning the risk controls AllianzGI was required to have in place.

85.     By the end of February 2020, AllianzGI positioned the Alpha 500's portfolio to generate returns if the market stabilized and volatility levels declined.  The Alpha Funds' month-end holdings for February 2020 reveal that they had a net short put position—meaning the Alpha Funds would produce returns if the markets became ***less*** volatile—which left them severely exposed to the soaring volatility that accompanied the March 2020 market decline.

86.     For example, as illustrated in the chart below, as of February 29, 2020, the AllianzGI Structured Alpha 1000 Plus—another Structured Alpha fund that performed and was structured similarly to the Alpha 500—was positioned so that declines in VIX (indicating that investors were less interested in buying protection against volatility) would yield modestly positive returns, whereas any increases in VIX (investors are more interested and paying more for protection against volatility) would cause returns to plummet—demonstrating a lack of basic risk management.



87.     Moreover, it appears that, as of February 29, 2020, the Alpha Funds were not even hedged against normal price changes in the S&P 500 with non-crisis-levels of volatility.

88.     As set forth in the chart below, even assuming no changes in VIX, as of February 29, 2020, Alpha 1000 Plus's portfolio was structured such that a downward change in the S&P 500 would cause a significant decline in the value of the portfolio.



89.     A very basic "terminal value" stress test on the Alpha 500's portfolio as of January 31, 2020, and February 29, 2020 would have revealed, to the expected dollar, outcomes for the Alpha 500 under scenarios measuring a combination of the decline in the S&P 500 and higher volatility.  Such stress test results would have made clear the losses that would result from the Alpha 500's positioning, and the fact that the Alpha Funds were extraordinarily exposed to a short volatility "tail risk" event in advance of the February and March 2020 market moves viewable to AllianzGI.

90.     But in breach of its duties, AllianzGI positioned the Alpha 500's portfolio in a manner that was not "crash protective" but rather the reverse—highly exposed to losses during a period of market stress.  Rather than having positions that would protect investors in the event of a market downturn, as AllianzGI was required to maintain, the Alpha 500 was not hedged against a normal market decline, much less a major drawdown amid continuing volatility.  The Alpha 500's positions in volatility options were similarly not "market-neutral," but rather were positioned to decline in value if there was an increase in volatility.  This, again, was contrary to the investment

mandate that the Fund not make "directional" bets and hedged against volatility and equity market declines.

91.     Instead, AllianzGI was effectively gambling that the Alpha Funds would reap substantial returns by selling an immense amount of high-premium option insurance both in S&P put options and naked VIX and VXX call options.  At the same time, the supposed "protection" provided by the put options that actually were in place was meaningless because those options had strike prices that were too low (and maturities that were too short-dated) to actually be useful in a market crash, as Allianz defined it.  While this positioning nominally adhered to Allianz's prior promise to "[b]uy put options—in a greater quantity than sold," this "crash protection" was in reality just cosmetic "window dressing."

92.     Unfortunately for the ERP, the market conditions anticipated by Allianz's economists and investors at large came to pass, as the VIX continued to increase in March 2020 as the economic impact of the coronavirus triggered a multi-week stock market decline.

### E.     AllianzGI's Imprudent Investments and Self-Interested Mismanagement in March 2020 Locked in the Alpha 500's Losses

93.     Not only did AllianzGI fail to properly hedge for an ongoing market downturn in late February 2020, AllianzGI again abandoned its investment mandate in March 2020 and positioned the Fund's portfolio in a manner that exacerbated losses.

94.     AllianzGI tried to reverse the Alpha Funds' February 2020 losses by doubling down on its prior bet, and attempted to "recoup" those losses by increasing the portfolios' spreads based on the (incredibly risky) assumption that the market would not continue to decline.  AllianzGI has now admitted that in early March 2020, it embarked on this new approach, which it has referred to, ironically, as "de-risking."   In this case, "de-risking" apparently meant (a) buying back short positions in a falling market (at significant cost), (b) further shorting volatility, and (c) failing to

hedge the Funds' portfolios to protect against further losses. This "de-risking" move was a total abandonment of the investment strategy, hedging and risk management practices that AllianzGI had promised to the ERP.

95. On March 9, 2020, amid growing fears about the spreading coronavirus, the S&P 500 declined by 7% within five minutes of the opening bell. As Allianz SE's chief economist had warned, the markets worsened and remained highly volatile—the exact opposite of what AllianzGI had bet.

96. On March 11, 2020, after the coronavirus spread from China to over 100 other countries, the WHO declared the outbreak a global pandemic.

97. Against the backdrop of the broad market decline, the returns on AllianzGI's Alpha Funds for the first quarter of 2020 severely underperformed their benchmark indices. Specifically, the returns for the first quarter of 2020 were -75.52% for the Alpha 500 as compared to -19.60% for the S&P 500 Index.

98. The Alpha 500 did not only severely underperform its benchmark index—it also performed disastrously as compared to funds with very similar strategies, demonstrating the severe impact of AllianzGI's departure from the Alpha 500's mandate and its irresponsible and imprudent re-positioning efforts in March 2020. For example, as reported by Bloomberg on April 8, 2020, funds with comparable options trading strategies, such as those that make up the CBOE Eurekahedge Relative Value Volatility Hedge Fund Index—an equally weighted index of 15 funds with relative value or opportunistic volatility strategies (like the Alpha Funds)—increased by 11.1% in March 2020 (from the end of February 2020), its best month since 2005. On an overall basis, during March 2020 the funds included in that Index had a positive return of 3.5%. Similarly, QVR Advisors, which employed a "market-neutral" volatility options strategy similar to the one

the Alpha Funds purportedly followed, posted a 52.6% return in March 2020 following a 6.1% return in February.

99.     AllianzGI also either failed to conduct adequate stress tests or ignored their results. Adequate stress testing for dramatic market movements—which Allianz Global Investors and the AllianzGI management team purported to perform for the Alpha 500 regularly—if properly done, would have highlighted the risks of a severe, multi-week decline like that which occurred in March 2020.

100.     Specifically, proper stress testing would have revealed the inherent shortcoming of AllianzGI's strategy of hedging short S&P 500 put and call positions with short VIX calls.  Indeed, proper stress testing would have accounted for the well-documented phenomenon of a "phase transition" period where volatility instruments move in parabolic fashion higher in times of acute short-term stress—a core feature tested under any reasonable options portfolio analysis.

101.     Adequate stress testing would also have revealed that the Alpha 500's hedging positions would be entirely ineffective against a market crash and amounted to mere "window dressing."  While AllianzGI maintained more long out-of-the-money S&P put options than short near-the-money options, the strikes and short maturity of the long option positions were always so far away that they were never going to provide any substantive portfolio protection.

102.     The net result of AllianzGI's positioning of the Alpha 500, including the lack of any meaningful downside hedging positions, was that the Alpha 500 was effectively synthetically almost twice as long as the general market and had "doubled down" on a gamble that the market volatility would subside.  In fact, AllianzGI's own post-mortem analysis of the March period admits that only as of "approximately early March 2020" did it finally give up on this strategy and

start to simply outright cover short puts without selling more VIX calls—conceding that it was following an initial "double down" "de-risking" plan until that point.

103.    In breach of its duties of loyalty and care, AllianzGI took the massive risk of "doubling down" on its prior failed strategy in March 2020, without regard for the potential to increase ERP's losses, because AllianzGI needed to reverse the Fund's existing losses by March 31, 2020 in order to salvage its ability to continue collecting performance-based management fees from ERP and the other investors in the Structured Alpha Funds.

104.    Pursuant to the Alpha 500 Agreements, AllianzGI did not receive a flat management fee, but rather received a performance fee of 30% of the excess of the "Net Capital Appreciation," or the quarterly increase in the value of the Alpha 500's net assets pre-withdrawals, allocated to the account of each investor in the Alpha 500 for the quarter over the return of the applicable benchmark index.  For example, if the S&P 500 increased by 10% in a calendar quarter, and the value of Alpha 500 increased by 12%, AllianzGI was entitled to 30% of the 2% overperformance.

105.    However, as a result of a "high-water mark" provision, Allianz received no fees for the management if the Fund underperformed its benchmark index.  In addition, Allianz was required to recover the amount of the underperformance through overperformance in future quarters before it could begin receiving fees again.

106.    Under the Alpha 500 Agreements, the amount by which the Fund underperformed its benchmark index at the end of a calendar quarter was added to a "Recovery Account." AllianzGI received no management fees unless the value of the "Recovery Account" was zero.  If the Recovery Account was greater than zero, any overperformance amount at the end of a calendar quarter would be subtracted from the Recovery Account until it reached zero.  Upon reaching zero, AllianzGI would be entitled to begin receiving performance fees again on any end-of-quarter

overperformance.   Therefore, a substantial underperformance, like the one experienced in
February and March 2020, would cause a substantial increase in the Recovery Account amount,
which would need to be offset by massive overperformance before AllianzGI would begin to
receive fees again.

107.    Despite this incentive structure, AllianzGI assured investors that it would not result
in excessive risk-taking, including because Allianz SE closely monitored the Structured Alpha
Funds' risks.   For example, Tournant assured investors that the zero-base-fee structure did not
create the risk that Allianz would simply abandon investors should a Fund encounter a period of
negative returns.   Describing Allianz as a "master cop," Tournant said that the Structured Alpha
Funds would "structurally" never "swing for the fences" or "try to triple down or double down" in
the event of a rough patch, emphasizing that Allianz SE was "monitoring every position" the
Structured Alpha Funds took.

108.    Allianz found itself in that very situation of underperformance—and no fees—at
the end of February 2020, however, with Alpha 500 underperforming the S&P 500 Index by nearly
10%.  AllianzGI needed to correct this underperformance by the end of March 31, 2020 or else it
would be required to recover these substantial losses before it could receive any new fees, which
would be extremely difficult in a volatile and declining market environment that had exposed the
flaws in Allianz Global Investors' management of the Alpha Funds.

109.    In light of the losses that the Alpha Funds had suffered by the end of February 2020,
Allianz knew its management of the Alpha 500 would not be profitable for the foreseeable future—
unless it could reverse the losses before March 31, 2020, the end of the calendar quarter.   These
losses put the entire Alpha 500's strategy at grave risk as the management of the funds and risk
management was perceived to be severely deficient.   Indeed, the Alpha Funds' family's structured

strategy, with several billions of dollars invested, was extremely lucrative for Allianz, generating substantial profits annually and likely hundreds of millions in fees over its lifespan.  As noted below, investor redemptions across the Structured Alpha Funds had begun and would only accelerate.

110.    Given the narrowing prospects for profitability, Allianz was willing to take the high-risk gamble it embarked upon in February 2020—which could result in catastrophic losses for Allianz's investors like the ERP—because AllianzGI was in a position where management of the Alpha Funds likely would not be profitable in the foreseeable future.  Contrary to AllianzGI's assurances that the zero-base-fee structure would not result in AllianzGI "swinging for the fences," the fee structure in fact led Allianz to do exactly that.  Accordingly, AllianzGI took this unsuccessful gamble throughout March 2020, and continued to short volatility, without any meaningful hedges, at the same time that it was clear to the market that volatility remained high.  Volatility continued to increase throughout March 2020 and the Alpha Fund's losses worsened.

**F.    In a Desperate Attempt to Stem Losses, Allianz Manipulated A Key Volatility Index to Inflate the Alpha Funds' Valuations**

111.    Allianz's desperation to generate gains and avoid losses across the entire family of Structured Alpha Funds during March 2020 created the incentive to take extreme risks and further deviate from the mandated investment strategy, including by potentially trading options in order to manipulate the settlement price of the VIX futures contract on March 18, 2020.

112.    The Structured Alpha portfolios (including the Alpha 500) would benefit from such trading because they had sold a significant number of call options on the VIX that matured on March 18, 2020, with exercise prices around $25-$30.  If the VIX futures contract expiring on March 18 settled at $75, each contract would have cost the Structured Alpha Funds about 50 times the index multiplier of 100, or around $5,000 per contract.  A higher VIX futures settlement price

would increase those losses substantially, whereas a lower VIX opening price on March 18 would allow the holder of the March 18 expiring call options contracts to decrease losses significantly.

113.    Between the close on March 17, 2020 and the close on March 18, 2020 the spot VIX Index futures changed little, reflecting little overall change in investors' pricing of volatility. Specifically, on March 17, the VIX Index closed at $75.91.  On March 18, the VIX Index closed at $76.45, an increase of just 0.7%.  In fact, in extended session trading prior to the open on March 18, VIX Index futures traded as high as $81.95, representing an increase of 8% from the March 17 closing price.  This increase reflected investors' expectations that the VIX Index would open near $81.95, further signaling an increase in volatility.

114.    However, on March 18, 2020 the VIX Index opened at $69.37, the low for the day, and at a substantial decline of 8.6% from the March 17, 2020 close, and, critically, a decline of $12.58, or 18%, from the extended session trading occurring immediately before the open.  The opening price on March 18, which was anomalous to the pricing on the prior day, or at any time after the open on March 18, was used to calculate the settlement price of the March VIX Index futures and option contracts and thus determine the value of the options that AllianzGI had sold. The drop at the opening, followed by a rebound during the trading day, indicates potential manipulation of the open by AllianzGI.



115.     Specifically, on March 18, 2020, the opening auction to calculate the final settlement price for the monthly March 2020 VIX futures and option contracts expiring that day was conducted.  In this March 18 opening auction, there was an exceedingly high volume of trading in the S&P options that are used to calculate the VIX futures settlement price (compared to historical volume data), which was four times greater than at any similar auction in the past year or since that time.



116.     Also, options of very low strike prices, which have a significant influence on the calculation of the VIX, were traded in high volumes and at low prices.  In fact, many of the options

traded in the March 18, 2020 auction made little economic sense—as they would only provide an economic benefit in the entirely implausible event the S&P declined by 85%—unless the purpose of those trades was to artificially lower the settlement.

117.    The trading in the March 18, 2020 auction is consistent with an effort to lower the settlement price of the March expiring VIX Index futures.  As an investment manager who had significant exposure to positions affected by the VIX March Index futures settlement price on March 18, 2020 through its management of its Structured Alpha product family, including the Alpha 500 in which the ERP invested, AllianzGI had a clear motive to lower the VIX settlement price on that date.

118.    The manipulation described above would have violated both the investment mandate and the Agreements governing the ERP's investment in the Alpha 500.

### G.    Following The Anticipated Market Conditions in February and March 2020, the ERP Withdrew Its Remaining Investment in the Alpha 500

119.    The dramatic losses that the Alpha Funds suffered throughout the market downturn were at odds with the structural risk protections that AllianzGI was required to have in place for the Alpha Funds.  Contrary to its obligations to have ample collateral available for flexible restructuring and to always have more long puts than short, the significant portfolio losses and leveraging in the Alpha Funds posed a high risk of a margin call by AllianzGI's prime brokers. Adequate stress testing for dramatic market movements—which the AllianzGI management team and Allianz Global Investors were required to perform for the Alpha Funds regularly—should have highlighted the risks of a severe, multi-week decline and sudden uptick in volatility like that which occurred in February and March 2020.

120.    Indeed, the market downturn in February and March 2020 was hardly unprecedented, and resembled a pattern that has repeated numerous times in numerous contexts.

The Great Depression saw an 89% decline over a period of about 34 months and the Great Recession saw the markets fall by 49% over a period of 16 months.  On October 19, 1987, commonly known as "Black Monday," the Dow Jones Industrial Average declined over 22%, the largest single-day decline in history.

121.    In comparison, on March 16, 2020, the date of the biggest one-day drop of the coronavirus-related downturn, the Dow dropped just under 13%.  Over the span of several weeks from mid-February through March 2020, the Dow lost about 35% of its value.  Indeed, a March 31, 2020 research note by AllianzGI acknowledged, "Even though US equity markets have fallen around 25% this year, previous down-turns were worse: markets fell about 50% from peak to trough in 2001 and 2008[.]"

122.    Similarly, periods of sudden spikes in volatility are common and occur at least once a decade.  Tournant himself acknowledged that VIX has ranged from 9 to 90, and AllianzGI purportedly used this prior historical precedent for modeling and stress-testing the Alpha Funds.  VIX repeatedly peaked during the period of August 2011 to October 2018, including reaching a high of 50.3 in February 2018 compared to an average of 10.8 for the 30 prior trading days.  On February 5, 2018, a day that would come to be known as "Volmageddon," VIX jumped by a record 20 points.  AllianzGI specifically drew a comparison to that "volatility surge" in its fourth-quarter 2019 commentary for the Structured Alpha Funds, stating, "Structured Alpha's option portfolio is positioned for a strong improvement in the event of another February 2018-type move" as "refinements we have implemented since then as part of our ongoing R&D process have made the option portfolio more resilient"—and described in detail with the ERP how the Structured Alpha Funds' February 2018 experience was evidence of the strategy's "rigorous risk management" and "overall resilience."

123.    By late February 2020, as coronavirus-related fears weighed on the markets, media outlets drew comparisons to February 2018, noting a "brutal sell-off in stocks" was causing the SPDR S&P 500 ETF Trust, which tracks the S&P 500, to head for "its biggest weekly drawdown in two years" since the "biggest-ever volatility spike in an event that came to be known as 'Volmageddon.'"

124.    And yet, despite the ample historical precedent for a market drawdown and sudden volatility surge like what occurred in February and March 2020, and contrary to its purported superior and "proprietary" risk management acumen, AllianzGI's management of the Alpha Funds' portfolios only increased the likelihood of catastrophic losses.  As an investment manager charged with being prepared for market downturns and to have "reinsurance" against catastrophic shocks, AllianzGI was required to have proper hedging positions in place to protect its clients' investments in the event of a sudden downturn.  AllianzGI also should have maintained proper risk management protocol and stress testing to ensure that it remained disciplined with its downside protections.

125.    In late March 2020, in an implicit admission of the failure of the Alpha Funds' recent strategy, Allianz proposed a new portfolio structure that would attempt to capitalize on an attractive volatility environment.  But given AllianzGI's failure to adhere to the Funds' mandate, its lack of proper risk management measures, and its disastrous attempt to salvage the portfolio, the ERP redeemed its investment in the Alpha 500.

126.    On April 7, 2020, Morningstar highlighted AllianzGI's negligence in a report titled "A failure in risk management," downgraded the Alpha Funds to "Negative" across all share classes, and recommended that investors avoid the Alpha Funds.  As Morningstar noted, AllianzGI's attempts to restructure the Alpha Funds "expos[ed] a serious weakness in the strategy"

and that risk management failures and imprudent restructuring efforts actually "locked in the strategy's . . . losses."

127.    On May 1, 2020, the ERP submitted a request to withdraw its investments in full from the Alpha 500.

128.    The ERP suffered losses of at least $149 million on its investment in the Alpha 500 due to AllianzGI's misconduct and breaches of duties it owed to ERP.

## COUNT I
## CLAIM FOR BREACH OF FIDUCIARY DUTY

129.    As a registered investment adviser serving as Managing Member and Investment Manager of the Alpha Funds, AllianzGI owed a fiduciary duty to the ERP, including as arising from its advisory relationship with the ERP.

130.    During the term of the ERP's investment in the Alpha 500 and at the time AllianzGI engaged in the misconduct described above, over 25% of the assets in the Alpha 500 were "plan assets," the rights of ERISA investors in Alpha 500 was extended to non-ERISA investors like the ERP, and AllianzGI was under a direct fiduciary obligation to the ERP to manage its investment assets consistent with ERISA fiduciary standards, including duties of care, skill, prudence, diligence, loyalty and diversification of assets.

131.    AllianzGI expressly acknowledged that it was the ERP's fiduciary. Specifically, AllianzGI acknowledged that it was a fiduciary, and required to abide by ERISA fiduciary standards regardless of whether ERISA technically applied.  For example, in the LLC Agreement, AllianzGI expressly acknowledged that it was the ERP's fiduciary.  Specifically, AllianzGI acknowledged that it was a fiduciary, and required to abide by ERISA fiduciary standards regardless of whether ERISA technically applied. For example, in the LLC Agreement, AllianzGI agreed that it would comply with ERISA fiduciary standards "to the extent the underlying assets

of the Company constitute 'plan assets' within the meaning of ERISA . . . [AllianzGI], in its capacity as 'investment manager' of the Company . . . shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under Section 404(a)(1)(B) of ERISA." LLC Agreement § 2.12.  Further, "[t]o the extent that the underlying assets of the Company do not constitute Plan Assets, Allianz Global Investors U.S. LLC… shall at all times use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries" under ERISA.  *Id.*

132.    In addition, the LLC Agreement and Subscription Agreement appointed AllianzGI as ERP's representative and attorney-in-fact with respect to its investment in the Alpha 500, a designation that imposes the fiduciary duty of loyalty on the attorney-in-fact.

133.    AllianzGI's fiduciary duties to ERP also followed from the fact that AllianzGI exercised full discretion in the management of the Alpha 500's portfolios, including the construction of the option positions, spreads, timing of trades and selection of indexes, and AllianzGI's repeated representations that it was acting in a fiduciary capacity with respect to ERP's investments in the Alpha 500.

134.    AllianzGI's fiduciary responsibility required it to seek to achieve ERP's stated investment objective by investing ERP's assets within the parameters of ERP's stated investment guidelines under the Agreements.

135.    AllianzGI's fiduciary duties to the ERP also arose out of AllianzGI's status as an investment advisor to the ERP and its conduct demonstrating it was acting as a fiduciary in monitoring, advising and communicating with the ERP with respect to its investments in the Alpha 500, including providing detailed information and responses to the ERP's questions about the Fund's performance in February 2018 and throughout the time the ERP was invested in Structured

Alpha.

136.    AllianzGI had an obligation to carry out its fiduciary duties with respect to the Alpha 500 with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and with experience and familiarity with options trading, portfolio strategy and market risks would use in a similar situation.  Here, that meant AllianzGI was required, among other things, to conduct stress testing of the portfolio to anticipate potential losses in market conditions similar to those that existed in the first half of 2020, to respond prudently in response to the results of those stress tests, to have the trading sophistication and proficiency to navigate and protect the Fund's assets in a wide range of market conditions, including those which existed in the first half of 2020, and to prudently respond in the face of declining fund performance, and to transparently communicate and advise the ERP about these facts.

137.    AllianzGI breached its fiduciary duty to the ERP by failing to structure adequate risk protections into the Alpha Fund's portfolio, failing to conduct or respond to portfolio stress testing, by failing to act prudently in the face of declining fund performance, and by failing to properly advise the ERP about these facts and their impact on the ERP's investment.

138.    Specifically, AllianzGI failed to hedge the Alpha Fund's holdings against a severe market downturn and failed to build structural risk protection into the Alpha Fund's portfolio.

139.    AllianzGI also failed to conduct adequate stress tests to assess the ability to trade the Alpha 500's portfolio during times of low market liquidity or disregarded the results of the tests it conducted.

140.    AllianzGI also made unreasonable assumptions for changes in VIX leading up to and during the market downturn in the first quarter of 2020 in light of the contrary evidence

undermining those assumptions, or disregarded the assumptions it had in fact made about VIX performance.

141.     Moreover, AllianzGI breached its fiduciary duty to the ERP by "doubling down" on its positions in March 2020 and continuing to sell additional short volatility options rather than prudently exiting losing positions.  This doubling down exacerbated the ERP's losses.  AllianzGI did so, for among other reasons, because AllianzGI would have been unable to obtain fees from ERP or the other Alpha Fund investors for the foreseeable future if it had prudently exited losing positions, but may have been able to continue to receive them if it had successfully executed a high-risk strategy to reverse the decline before the end of the quarter.

142.     Defendants Allianz SE, AAM GmbH, Allianz of America, AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

143.     By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

144.     The Allianz Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Funds through the operation of "Allianz Global Investors."  In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

145.    As a direct and proximate result of the actions and omissions by the Allianz Defendants set forth above, the ERP has sustained actual damages in an amount to be proven at trial.

## COUNT II
## CLAIM FOR NEGLIGENCE

146.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

147.    As Managing Member of the Alpha 500, AllianzGI owed a duty of care to Plaintiff based on the special relationship, or "privity," arising out of the Agreements between AllianzGI and the ERP regarding the Alpha 500. The PPM provided that AllianzGI was "responsible for the general management of the investment portfolios of the Fund under the Operating Agreement[s]." Further, the LLC Agreement specifically provided that AllianzGI, as Managing Member of the Alpha 500, could be liable for its negligence as it was exculpated from liability for acts or omissions with investments in the Alpha 500 "unless such action or inaction was made in bad faith or constitutes willful misconduct or negligence."

148.    The standard of care AllianzGI owed to the ERP was also informed by the numerous representations it made to Plaintiff concerning how it would safeguard the ERP's assets and carry out the investment strategy for the Alpha 500.

149.    AllianzGI breached its duty to the ERP by failing to exercise reasonable care in properly protecting the Alpha 500 against a severe market downturn.

150.    Specifically, AllianzGI failed to conduct adequate stress tests to assess the ability to trade the Alpha 500's portfolios during times of low market liquidity or disregarded the results of the tests it conducted.

151.    In addition, AllianzGI abandoned the hedging strategies that it was supposed to have in place to provide structural risk protections to the Alpha 500 in any market environment.

152.    AllianzGI also made unreasonable assumptions for changes in VIX leading up to and during the market downturn in the first quarter of 2020 in light of the contrary evidence undermining those assumptions, or disregarded the assumptions it had in fact made about VIX performance.  There had previously been no less than seven prior instances when the VIX had printed above 50 (and 13 times that it had traded above 35) which Allianz seemingly ignored or elected never to actually be prepared for.

153.    AllianzGI further was negligent by taking actions during the downturn—including by continuing to sell naked short volatility call options at the very time volatility was increasing —that locked in and exacerbated the Alpha 500's negative returns.

154.    AllianzGI's mismanagement of the Alpha 500 runs contrary to AllianzGI's duty to build "structural risk protection" into its portfolios, as AllianzGI—as Managing Member of the Alpha 500—was obligated to do on behalf of its investors.

155.    Defendants Allianz SE, AAM GmbH, Allianz of America, AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

156.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

157.    The Allianz Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Fund through the operation of "Allianz Global Investors."  In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

158.    As a direct and proximate result of the actions and omissions by the Allianz Defendants set forth above, the ERP has sustained actual damages in an amount to be proven at trial.

## COUNT III
## CLAIM FOR BREACH OF CONTRACT

159.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

160.    AllianzGI had contractual obligations to the ERP under the Agreements, including the PPM, which were explicitly incorporated in the Agreements entered into by AllianzGI and ERP.  Pursuant to the PPM, AllianzGI, as Managing Member, was obligated to set up a beta or futures component for each Alpha Fund consisting of various investments to provide exposure to the benchmark indexes.

161.    Further, the Alpha 500's alpha component was supposed to "consist of investments in puts and calls on equity indices through the use of a proprietary model to construct option spreads." PPM at 1. The strategy's stated objective was to "create option-based profit zones that, upon expiration of the options, will capture positive payoffs if the level of the underlying index (or other instrument) ends up within the profit zone."  *Id.* at 1.  AllianzGI was obligated to "optimize spread positions and profit zones based on (a) targeted positive return potential, (b) structural risk protections, (c) collateral management, and (d) flexibility to restructure profit zones if necessary." *Id.* at 2.

162.    Under the Agreements, AllianzGI was required to manage the ERP's investment assets under ERISA fiduciary standards, including duties of care, skill, prudence, diligence, loyalty and diversification of assets. In the LLC Agreement, AllianzGI agreed that it would comply with ERISA fiduciary standards "to the extent the underlying assets of the Company constitute 'plan assets' within the meaning of ERISA . . . [AllianzGI], in its capacity as 'investment manager' of the Company . . . shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under Section 404(a)(1)(B) of ERISA." LLC Agreement § 2.12. During the term of the ERP's investment in Alpha 500 and at the time AllianzGI engaged in the misconduct described above, over 25% of the assets in the Alpha 500 were "plan assets" and AllianzGI was under a direct fiduciary obligation to the ERP to manage its investment assets consistent with ERISA fiduciary standards. Further, to the extent that "the underlying assets of the Company do not constitute Plan Assets," AllianzGI was required to "use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries under Section 404(a)(1)(B) of ERISA." *Id.* The LLC Agreement also prohibited AllianzGI from considering its own interests and the interests of its affiliates whenever the assets of the Alpha 500 were "plan assets." *Id.* § 2.01.

163.    Under the Agreements, AllianzGI could not take any unlawful action in connection with the management of Fund assets.

164.    AllianzGI breached these contractual obligations by failing to build proper risk protections into the Alpha 500's portfolio in accordance with the stated investment strategy, failing to prudently protect ERP investment assets, and failing to promptly notify the ERP of the fundamental—and, as evidenced by the severe underperformance of the Alpha 500 as compared

to its benchmark index, material—change in its investment strategy it undertook as the market downturn began in February 2020.

165.   Defendants Allianz SE, AAM GmbH, Allianz of America., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

166.   By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

167.   The Allianz Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Structured Alpha Funds through the operation of "Allianz Global Investors."  In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

168.   As a direct and proximate result of the actions and omissions by the Allianz Defendants set forth above, the ERP has sustained actual damages in an amount to be proven at trial.

## V.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.  A declaration that Defendants are liable for breach of fiduciary duty to Plaintiffs in the course of the management of the Alpha 500, causing the ERP's loss;

2.  A declaration that Defendants are liable for negligence in connection with the management of the Alpha 500, causing the ERP's loss;

3. A declaration that Defendants are liable for breach of contract to Plaintiffs in connection with the management of the Alpha 500, causing the ERP's loss;

4. A money judgment against Defendants in an amount exceeding $75,000.00, the amount to be determined at trial;

5. An Order awarding pre- and post-judgment interest to Plaintiffs;

6. An Order awarding to Plaintiffs any such equitable/injunctive or other further relief as the Court may deem just and proper.

## VI.   JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.


Dated:  September 2, 2021                    Respectfully submitted,

                                             */s/ Hannah Ross*
                                             **BERNSTEIN LITOWITZ BERGER
                                                & GROSSMANN LLP**
                                             Hannah Ross
                                             Avi Josefson
                                             James Harrod
                                             Michael Blatchley
                                             1251 Avenue of the Americas
                                             New York, NY 10020
                                             Telephone: (212) 554-1400
                                             Facsimile: (212) 554-1444

                                             -and-

                                             Jared D. Giddens (*pro hac vice* motion
                                             forthcoming)

                                             Of the Firm:
                                             CONNER & WINTERS, LLP
                                             1700 One Leadership Square
                                             211 N. Robinson
                                             Oklahoma City, OK 73102
                                             Telephone:  (405) 272-5711
                                             Facsimile:  (405) 232-2695

                                             *Counsel for Plaintiffs the Christian Brothers
                                             Employee Retirement Plan and Dan Stremel*

# APPENDIX A

